OPINION
Defendant-appellant, Mark Brown, appeals his conviction in the Mahoning County Court of Common Pleas on two counts of aggravated murder, for one of which appellant was sentenced to death.
During the evening of January 28, 1994, appellant was walking in the Kimmelbrook housing projects in Youngstown, Ohio when Gary Thomas and his nephew Allen Thomas drove by. Allen Thomas, a friend of appellant, had Gary Thomas stop the car and pick up appellant. The three men proceeded to a drive-through store at the corner of Albert and Victor Streets, where they purchased beer and wine. Upon leaving the store, the three drove to the residence of Lisa Dotson, a relative of Allen Thomas. En route to the Dotson residence, the three stopped at a convenience store at the corner of Elm and New York Avenues called the Midway Market, to buy "blunt" cigars. These "blunt" cigars were emptied of tobacco and refilled with marijuana.
Upon their arrival at the Dotson residence the three men began to play cards. A number of juveniles were at the house at the time including Myzelle Arrington, Marcus Clark, and Antwaine McMeans. While the men played cards Allen Thomas and appellant drank Thunderbird wine into which valium had been dissolved. In addition, appellant smoked some of the "blunt" cigars containing marijuana. While playing cards appellant stated to Allen Thomas that he wanted to do what the characters in "Menace to Society" had done. According to the testimony of Gary Thomas, "Menace to Society" is a movie, at the beginning of which some individuals enter an "Oriental store" and kill two store clerks before leaving with the store's cash. Gary Thomas also testified that he noticed that appellant had a gun on him while they were playing cards.
After several hours, the three men left the house and returned to Kimmelbrooks to purchase more marijuana. After making the purchase, the three then returned to the Midway Market to purchase more "blunt" cigars. At about the same time as the three men were driving towards the store, the juveniles at the Dotson residence began walking to the store. Indeed, Marcus Clark testified that the juveniles were leaving the store just as appellant and Allen Thomas were entering.
The Salman family had owned and operated the Midway Market as a family business for over twenty years. On duty in the store on January 28, 1994 were Isam Salman (Salman) and Hayder Al-Turk (Al-Turk). Salman, at the time aged 32 and the father of seven children, was the son of the store owner, and Al-Turk had been an employee at the store for approximately a year. Notably, because a family member was working on the night in question, the video surveillance cameras inside the store were not turned on.
When the three men arrived at the store, Gary Thomas stayed in the car listening to music while Allen Thomas and appellant went inside. Allen Thomas and appellant returned to the vehicle but appellant then stated that he had forgotten to do something and went back into the store. Marcus Clark testified that he saw appellant put on a mask before re-entering the store but that Allen Thomas remained in the vehicle. Another of the juvenilles, Myzelle Arrington testified that both appellant and Allen Thomas re-entered the store. Gary Thomas testified that Allen Thomas did re-enter the store with appellant but came back out immediately.
In any event, Clark, Arrington, and Gary Thomas all testified that while appellant was in the store they heard gunshots being fired. Appellant returned to the vehicle and when questioned by Gary Thomas about the gunshots, appellant responded that it had just been some firecrackers exploding. The three men then left the scene and returned to the Dotson residence where appellant was observed wiping off his gun. In addition, Gary Thomas testified to seeing blood on appellant's hands and clothing.
At approximately 9:55 p.m. the Youngstown Police Department responded to a call concerning the Midway Market. Upon arriving at the scene police officers found the bodies of Salman and Al-Turk behind the counter inside the store. Al-Turk was found laying on the floor and Salman was found kneeling underneath the counter. Both victims had died from multiple gunshot wounds.
Appellant was arrested on February 3, 1994 at an apartment in Warren, Ohio. At the time of the arrest police officers recovered a 9 mm handgun underneath some cushions on a couch. Appellant was transported to the Youngstown Police Department where he was questioned by Detectives Maietta and McKnight. As a result of the questioning appellant made a confession to the killing of Al-Turk but denied shooting Salman. Subsequently, shell casings found at the store were found to have been fired from the handgun recovered during appellant's arrest.
On March 4, 1994 the Mahoning County Grand Jury returned an indictment charging appellant with two counts of aggravated murder by prior calculation and design, in violation of R.C. 2903.01(A), two counts of aggravated murder while committing, attempting to commit, or fleeing after committing an aggravated robbery, in violation of R.C. 2903.01(B), one count of aggravated robbery, in violation of R.C. 2911.01(A)(1), and one count of having a weapon while under a disability in violation of R.C. 2923.13(A)(3). Each of the aggravated murder counts contained death penalty specifications pursuant to R.C. 2929.04(A)(5)[1] and (A)(7)[2]. All of the counts contained firearm specifications pursuant to R.C.2941.141 and the weapons under a disability count contained a physical harm specification pursuant to R.C. 2941.143.
On October 12, 1994 appellant filed a motion to suppress the statement given to police arguing that appellant had been incapable of waiving hisMiranda rights, that the statement had not been made voluntarily, and that the statement had been made in violation of appellant's right to counsel. A hearing was held on October 12, 1995 and on October 27, 1995 the trial court overruled the motion.
After sustaining appellant's motion to quash the initial venire of jurors, jury selection began on January 4, 1996. The evidentiary phase of the trial commenced on January 30, 1996 and the matter was submitted to the jury on February 7, 1996. The jury found appellant guilty on both counts of aggravated murder by prior calculation and design, but not guilty on the remaining counts of aggravated murder and aggravated robbery. For both counts of aggravated murder by prior calculation and design the jury returned guilty verdicts on the R.C. 2929.04(A)(5) death penalty specifications, but not guilty on the R.C. 2929.04(A)(7) death penalty specifications. In addition, the jury returned guilty verdicts on the firearm specifications attendant to the two aggravated murder counts.
The penalty phase commenced on February 20, 1996. The jury began deliberations on February 22, 1996 and the following day informed the trial court that it had reached an agreement on one of the recommendations but was deadlocked as to the other. The trial court read the Howard charge to the jury and instructed it to continue its deliberations. On February 24, 1996 the jury returned its verdict, recommending death for the killing of Salman and life imprisonment for the killing of Al-Turk. The jury was polled, during which one juror, Ella York, stated that the verdicts were not her own and that she had compromised with the other eleven jurors.
Thereafter, the trial court re-read the original charge to the jury. Several hours later the jury returned the same verdict as before. When the jury was polled, Juror York stated that the verdicts were hers and the jury was discharged. On February 28, 1996 the trial court sentenced appellant to death for the killing of Salman and to life imprisonment without eligibility for parole for thirty years for the killing of Al-Turk. In addition, the trial court sentenced appellant to three years incarceration on the two firearms specifications, all sentences to run consecutively. On March 15, 1996, appellant filed a timely notice of appeal.
Appellant brings fifteen assignments of error, the first of which states:
 "The Trial Court Erred in Overruling Appellant's Motion to Suppress His Confession, T.d. 38, 129, in Violation of Appellant's Privilege Against Self-Incrimination, and Appellant's Right to Counsel, U.S. Const. amend. V, VI
and XIV, and Ohio Const. art. I, §§ 1, 2, 10, and 16."
In his first assignment of error, appellant advances several arguments in support of his assertion that the trial court erred in overruling his motion to suppress his confession.
Our standard of review with respect to motions to suppress is whether the trial courts findings are supported by competent, credible evidence.State v. Winand (1996), 116 Ohio App.3d 286, 288, citing Tallmadge v.McCoy (1994), 96 Ohio App.3d 604, 608. This is the appropriate standard because "`[i]n a hearing on a motion to suppress evidence, the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses.'"State v. Hopfer (1996), 112 Ohio App.3d 521, 548, quoting State v.Venham (1994), 96 Ohio App.3d 649, 653. However, once we accept those facts as true, we must independently determine, as a matter of law and without deference to the trial court's conclusion, whether the trial court met the applicable legal standard. State v. Williams (1993),86 Ohio App.3d 37, 41.
Appellant first argues that he was incapable of making a voluntary, knowing, and intelligent waiver of his Miranda rights. In support, appellant points to his youth, limited education, and relative lack of criminal experience. He also maintains that he was under the influence of alcohol and marijuana at the time of questioning. Appellant also argues that he asked for an attorney prior to the waiver and the detectives ignored his request.
The issue of whether appellant knowingly, voluntarily, and intelligently waived his Miranda rights is examined against a "totality of the circumstances" standard. State v. Moore (1998), 81 Ohio St.3d 22,31. "Courts are to consider the circumstances surrounding the interrogation, including evaluation of the defendant's age, experience, education, background, intelligence, and capacity to understand the warnings given to him, the nature of his rights and the consequences of waiving those rights." State v. Burley (Aug. 11, 1998), Mahoning App. No. 93-CA-204, unreported, 1998 WL 544509 at *7, citing Fare v. MichaelC. (1979), 442 U.S. 707, 725.
Appellant signed a waiver of Miranda rights form. A written waiver is strong proof that the waiver was voluntary. State v. Cooey (1989),46 Ohio St.3d 20, 27, citing North Carolina v. Butler (1979), 441 U.S. 369,373. At the time of questioning, appellant was twenty-one years of age, had attended school to the tenth grade, could read and write, and had been involved in at least three prior felony arrests.
Appellant's testimony that he was under the influence of alcohol and drugs was refuted by testimony from Detective McKnight and Detective Sergeant Maietta. Both detectives testified that appellant did not appear to be under the influence of alcohol and/or drugs. (Motion to Suppress, p. 22, 74). Detective McKnight testified that appellant was alert and answered questions without any difficulty. (Motion to Suppress, p. 22). Detective Sergeant Maietta testified that appellant was friendly, cognizant, and appeared to understand what they were talking about. (Motion to Suppress, p. 74). Detective McKnight also refuted appellant's claims that he requested an attorney. (Motion to Suppress, pp. 30-32).
Based on the testimony of the detectives, there was competent, credible evidence to support the trial court's decision. Although appellant presented conflicting evidence, we are bound by the standard of review that the trial court was in the best position to resolve questions of fact and evaluate the credibility of witnesses. Therefore, we find the trial court did not err in finding that appellant did knowingly, voluntarily, and intelligently waive his Miranda rights.
Another issue, distinct from whether there was a valid waiver of rights, is whether appellant gave the confession voluntarily. Moore,81 Ohio St.3d at 31. As before, the "totality of the circumstances" standard governs the inquiry, "including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." State v. Edwards (1976),49 Ohio St.2d 31, 40-41.
Appellant alleges that the detectives induced his confession with promises of helping with his bond and letting him see his children. However, these allegations were refuted by testimony from Detective McKnight.[3] (Motion to Suppress, pp. 30-53).
Appellant also argues that the detectives deceived him by implying the existence of a videotape of the crime. The Midway Market was equipped with two video cameras connected to recording devices. However, because Salman, a family member, was working in the store, the video recorder was not activated at the time of the shootings. When the detectives questioned appellant, they drew a diagram of the store, pointed out the location of the video cameras, and apparently allowed him to believe that there was a videotape of the entire event. Appellant then told the detectives that he supposed they knew everything. The detectives responded that they did but that they wanted appellant to tell them what happened. Thereafter, appellant confessed to shooting one of the store clerks, Al-Turk, but denied shooting the other, Salman.
Appellant argues that this conduct on the part of the detectives amounted to "cajoled coercion," citing to State v. Sewell (Sept. 14, 1990), Mahoning App. No. 89 C.A. 161, unreported, 1990 WL 136576. In that case, the Sewell court rendered a confession and waiver involuntary when an officer testified that in conjunction with the reading of the Miranda
rights to a defendant, he also advised the defendant that "it's better to have your side of the story known in case there is anything we missed, we can talk to those people." Id. at *3. The Sewell court held this to be "cajoled coercion," finding that the statement created "hope or fear in respect to the crime charged and unconsciously impels a defendant to make a statement." Id., citing Bram v. United States (1897), 168 U.S. 532.
Decisions rendered by this court after Sewell have considerably abrogated its holding concerning the voluntariness of confessions. Subsequent to Sewell, we have repeatedly addressed the issue of police promises or misleading statements under the "totality of the circumstances" test approved by the Ohio Supreme Court. See State v.Gerish (Apr. 22, 1999), Mahoning App. No. 92 C.A. 85, unreported, 1999 WL 238943; Burley, supra; State v. Parish (Apr. 22, 1997), Mahoning App. No. 94-CA-83, unreported, 1997 WL 205285; State v. Reynolds (Nov. 12, 1996), Mahoning App. No. 93 C.A. 242, unreported, 1996 WL 664879; Statev. Eley (Dec. 20, 1995), Mahoning App. No. 87 C.A. 122, unreported, 1995 WL 758808; State v. Turick (Sept. 22, 1995), Jefferson App. No. 93-J-54, unreported, 1995 WL 562273; State v. Pue (July 26, 1995), Mahoning App. No. 92 C.A. 164, unreported, 1995 WL 447668. Furthermore, Sewell relied soley on Bram. In State v. Ward (July 31, 1996), Lorain App. No. 95CA006214, unreported, 1996 WL 425904 at *2, the Ninth District Court of Appeals made the following observation concerning how twentieth century jurisprudence has treated Bram:
 "Defendant cites Bram v. United States (1897), 168 U.S. 532, 42 L.Ed. 568, for the proposition that any promise — "however slight" — renders the confession involuntary. A near century of jurisprudence by the U.S. Supreme Court, as well as the Ohio Supreme Court, has rejected such a `wooden' interpretation. See, e.g., State v. Edwards (1976), 49 Ohio St.2d 31, 40, vacated on other grounds (1978), 438 U.S. 911, 57 L.Ed.2d 1155. Rather, both courts have repeatedly declared that each case turns on its own set of special circumstances. See, e.g., Colorado v. Connelly (1986), 479 U.S. 157, 93 L.Ed.2d 473.
We acknowledge that deception is a factor bearing on voluntariness.State v. Wiles (1991), 59 Ohio St.3d 71, 81. However, this factor, standing alone, is not dispositive of the issue, id., and appellant has not identified other sources of coercion. The key issue is whether a confession arises from the defendant's will being overborne. Schnecklothv. Bustamonte (1973), 412 U.S. 226. In those cases that best support appellant's position, the circumstances pointed much more strongly to a false confession dictated by an overbearing of the will through the fear of extraneous adverse consequences for failing to confess. For example, in Lynumn v. Illnois (1963), 372 U.S. 528, the defendant confessed only after police repeatedly misrepresented to her that she would lose state financial aid for her children and that her children would be taken from her if she did not cooperate. In Spano v. New York (1959), 360 U.S. 315, a police officer whom the defendant knew as a close childhood friend convinced the defendant that the officer might lose his job if the defendant did not cooperate with him by giving a confession.
A defendant who is completely innocent might well confess in the circumstances where there is a fear of extraneous adverse consequences. By contrast, an innocent defendant in the circumstances in our case would have little incentive to render a false confession. "A defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is."State v. Bays (1999), 87 Ohio St.3d 15, 23, quoting Ledbetter v. Edwards
(C.A.6, 1994), 35 F.3d 1062, 1070.
In light of the totality of the circumstances, we find that appellant gave the confession voluntarily. Factors bearing on the voluntariness of appellant's confession include the fact that no physical punishment or threats had been used and that appellant had not been deprived of physical necessities, such as food and drink, restroom facilities, or contact with family members. Moreover, appellant had prior experience with the criminal justice system and was sufficiently intelligent to appreciate the lessons of that experience; had been amply notified of his constitutional rights; and had been questioned for a reasonable period of time.
Accordingly, appellant's first assignment of error is without merit.
Appellant's second assignment of error states:
 "The trial court erred in permitting `other acts' evidence to be placed before the jury, thereby depriving Appellant a fair trial in violation of U.S. Const. amend. VI, VIII, and XIV; and Ohio Const. art. I §§ 1, 2, 9, 10, and 16, and Ohio Rev. Code Ann. § 2945.59 and Ohio Evid. R. 404(B)."
Appellant argues that the trial court erred in permitting appellee to introduce evidence that appellant had stolen the murder weapon six weeks prior to the murders in question and that appellant had been a member of a street gang. According to appellant, the introduction of this "other acts" evidence was prejudicial error which denied him a fair trial.
Appellee's first witness in its case-in-chief was Steve Jones (Jones). Jones testified that on December 13, 1993 he had been robbed at gunpoint and that the assailant had made off with some money and with Jones' car. Inside the car at the time was a Glock 9 mm handgun, later identified as the weapon recovered by police officers at the time of appellant's arrest. Although Jones did not know the name of his assailant at the time he claimed to have "seen him around before." Jones later told police officers that he had heard that appellant was the individual that robbed him. Subsequently, Jones picked out appellant from a photographic array.
Prior to trial, appellant sought the suppression of all evidence pertaining to the robbery of Jones. The trial court denied appellant's motion ruling that the evidence was to be used for the limited purpose of proving identity. Indeed, following Jones' testimony the trial court instructed the jury that the testimony was to be used for the purpose of determining the identity of appellant and not for determining whether appellant had actually robbed Jones or as proof of appellant's character.
The trial court has broad discretion in the admission and exclusion of evidence and, unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of a trial court. State v. Joseph
(1995), 73 Ohio St.3d 450, 460. R.C. 2945.59 and Evid.R. 404(B) provide the rules for the admission or exclusion of other crimes, wrongs, or acts. Generally, these rules are to be construed against admissibility of the "other acts" evidence. State v. Burson (1974), 38 Ohio St.2d 157,158.
"Other acts" evidence is admissible, however, if (1) there is substantial proof that the alleged other acts were committed by the defendant, and (2) the evidence tends to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. State v.Broom (1988), 40 Ohio St.3d 277, 282-283; Evid.R. 404(B); R.C. 2945.59. The other acts need not be similar to the crime charged. State v.Flonnory (1972), 31 Ohio St.2d 124, 126.
The Ohio Supreme Court dealt with the issue of the admissibility of other acts evidence to establish identity in State v. Lowe (1994),69 Ohio St.3d 527. The Court stated:
 "Identity is the least precise of the enumerated purposes of Evid.R. 404(B). Evid.R. 404(B) states that other acts are not admissible `to prove the character of a person in order to show that he acted in conformity therewith,' and we therefore must be careful when considering evidence as proof of identity to recognize the distinction between evidence which shows that a defendant is the type of person who might commit a particular crime and evidence which shows that a defendant is the person who committed a particular crime.
 "Other acts can be evidence of identity in two types of situations. First are those situations where other acts `form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment,' and which are `inextricably related to the alleged criminal act.' State v. Curry (1975), 43 Ohio St.2d 66, 73, 72 O.O.2d 37, 41, 330 N.E.2d 720, 725. * * *
 "Other acts may also prove identity by establishing a modus operandi applicable to the crime with which a defendant is charged. `Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B).' State v. Jamison (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, syllabus. `"Other acts" may be introduced to establish the identity of a perpetrator by showing that he has committed similar crimes and that a distinct, identifiable scheme, plan, or system was used in the commission of the charged offense.' State v. Smith
(1990), 49 Ohio St.3d 137, 141, 551 N.E.2d 190, 194. While we held in Jamison that `the other acts need not be the same as or similar to the crime charged,' Jamison, syllabus, the acts should show a modus operandi identifiable with the defendant. State v. Hutton (1990), 53 Ohio St.3d 36, 40, 559 N.E.2d 432, 438." (Emphasis added.) Id. at 5301-531.
In this case, there was sufficient evidence to prove that appellant committed the "other act" of robbing Jones of the murder weapon. Although when Jones reported the robbery he could not identify his assailant by name, he did give a description and indicated that he recognized the person and had "seen him around" before. Jones later called the police and informed them that he had heard "on the street" that Mark Brown was the individual who robbed him. Once Jones could put appellant's name with appellant's face, he was able to identify appellant as the assailant. Therefore, appellee met the first requirement for the admission of the "other act" evidence.
The next question is whether appellee could have used this prior act to establish identity.__This case involves the first situation mentioned inLowe. Appellant gained possession of Jones' handgun by robbing him. Shell casings at the murder scene were found to have been fired from that same handgun. Therefore, testimony concerning the robbery served to tie appellant to the murder weapon inextricably linking him to the murders in question and served to establish his identity as the perpetrator. Evidence of access to or possession of the murder weapon before the crime occurred is admissible to show opportunity or identity. See State v.Lancaster (1971), 25 Ohio St.2d 83. In this case, the robbery evidence as proof of identity did not show that appellant is the type of person who might commit a particular crime. Rather, it showed that appellant was the person who committed this particular crime.
Finally, the testimony by appellant's mother concerning his "gang" membership does not constitute other acts evidence. Rule 404(B) speaks to, "evidence of other crimes, wrongs, or acts." The testimony of appellant's mother that appellant had been a member of a gang does not rise to the level of an "other act" within the meaning of Rule 404(B).
Accordingly, appellant's second assignment of error is without merit.
Appellant's third assignment of error states:
 "The Trial Court Erred and Denied Appellant a Fair Trial by Allowing Appellant to Be Impeached with Both Prior Convictions and `Other Acts.' Ohio Const. art. I, §§ 1, 2, 10, and 16; U.S. Const. amend. VI and XIV."
Appellant argues that the trial court erred by allowing the admission of testimony concerning his prior felony criminal convictions for drug abuse and drug trafficking.
Evid.R. 609(A) provides in relevant part:
 "For the purpose of attacking the credibility of a witness:
"* * *
 "(2) notwithstanding Evid. R. 403(A), but subject to Evid. R. 403(B), evidence that the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."
Evid.R. 403(B) provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."
"[T]he trial court must consider Evid.R. 609 in conjunction with Evid.R. 403. Therefore, the trial judge has broad discretion in determining the extent to which testimony will be admitted under Evid.R. 609." State v.Wright (1990), 48 Ohio St.3d 5, 8.
Prior to trial, appellant filed a motion in limine to prohibit the state from impeaching him with his prior criminal convictions. In the alternative, appellant asked the trial court to declare Evid.R. 609 unconstitutional.
Contrary to the assertion made by appellant in his appellate brief before this court, our review of the record reveals that the trial court sustained appellant's motion in limine and overruled his motion to find Evid.R. 609 unconstitutional. Although the trial court declined to find Evid.R. 609 unconstitutional, appellant still got exactly what he wanted — that "[n]o reference * * * be made or questioned posed for impeachment purposes about or relating to Defendant's prior criminal conviction." (Judgment Entry dated September 25, 1995).
Prior to appellant taking the stand to testify on his own behalf, there was no testimony relating to appellant's criminal convictions. Despite the ruling in appellant's favor by the trial court excluding such testimony, appellant's trial counsel proceeded to bring up the issue of appellant's prior criminal convictions on direct examination.
Under the invited-error doctrine, a party will not be permitted to take advantage of an error which he himself invited or induced. State v. Bey
(1999), 85 Ohio St.3d 487, 493. Therefore, appellant cannot cite as error the introduction of evidence concerning his prior criminal convictions.
Accordingly, appellant's third assignment of error is without merit.
Appellant's fourth assignment of error states:
 "The trial court erred in overruling Appellant's motion to require the jury to articulate its methods and reasoning for determining that the aggravating circumstances outweigh the mitigating factors, T.d. 17, 111, 149 and in overruling Appellant's constitutional motion to dismiss, T.d. 123, thereby depriving Appellant of the ability to defend life, equal protection and benefit of the laws, the ability to remain free from cruel and unusual punishment, the administration of justice without denial, a remedy by due course of law, and due process of law, Ohio Const. art. I §§ 1, 2, 9, and 16 and U.S. Const. amend. VIII and XIV."
Under this assignment of error, appellant argues that the trial court erred in overruling appellant's motion to require the jury to articulate its methods and reasoning for determining that the aggravating circumstances outweigh the mitigating factors. The Ohio Supreme Court rejected a similar argument in State v. Jenkins (1984), 15 Ohio St.3d 164. In that case, the court stated:
 "In his next contention appellant focuses upon the requirements of R.C. 2929.021, 2929.03 and 2929.05, arguing that the extent of proportionality review in Ohio is constitutionally infirm. In the main, appellant contends that proportionality review in Ohio is flawed since there is no requirement for a jury, when recommending a sentence of life imprisonment over the imposition of the death penalty, to identify the existence of mitigating factors and why those factors outweigh the aggravating circumstances.
 "We first observe that appellant's argument that proportionality review is constitutionally required is without merit. In Pulley v. Harris (1984), [465 U.S. 37, 104 S.Ct. 871], 79 L.Ed.2d 29, the Supreme Court held that neither Gregg, Proffitt nor Jurek established proportionality review as a constitutional requirement. Id. [465 U.S. at ___, 104 S.Ct. at 878, 79 L.Ed.2d] at 39. * * *
 "Thus, although viewed as commendable, the decision in Pulley demonstrates that proportionality review is not constitutionally required in every case. Other factors which minimize the risk of arbitrary and capricious sentencing include bifurcated proceedings, the limited number of chargeable capital crimes, the requirement that at least one aggravating circumstance be found to exist and the consideration of a broad range of mitigating circumstances. In conjunction with prior United States Supreme Court decisions, the General Assembly incorporated the aforementioned factors into Ohio's death penalty statutes, as well as providing proportionality review — a meaningful function which reduces the arbitrary and capricious imposition of death sentences.
 "The question remains whether the absence of a requirement that juries specify the mitigating factors which they found to exist, and why these factors outweigh aggravating circumstances, creates a fatal defect in the statutes. We hold that it does not.
 "The fundamental purpose behind proportionality review is to ensure that sentencing authorities do not retreat to the pre-Furman era when sentences were imposed arbitrarily, capriciously and indiscriminately. To achieve this result, state courts traditionally compare the overall course of conduct for which a capital crime has been charged with similar courses of conduct and the penalties inflicted in comparable cases. See Gregg [428 U.S.] at 204-206, [96 S.Ct. at 2939-2940,] and Proffitt
[428 U.S.] at 259-260[, 96 S.Ct. at 2969-2970].
 "The system currently in place in Ohio enables this court to obtain a vast quantity of information with which to effectuate proportionality review, beginning with data pertinent to all capital indictments and concluding with the sentence imposed on the defendant, whether or not a plea is entered, the indictment dismissed or a verdict is imposed by the sentencing authority. See R.C. 2929.021, supra, at fn. 13. Although appellant would have this court require juries returning a life sentence to specify which mitigating factors were found to exist and why they outweigh aggravating circumstances, we conclude that such information is not an indispensable ingredient in assisting us to determine whether the imposition of a death sentence is disproportionate to sentences imposed for similarly proscribed courses of conduct." (Footnotes omitted; emphasis added.) Jenkins, 15 Ohio St.3d at 174-177
Relying on Jenkins, the Ohio Supreme Court has also held that a trial court does not err in failing to instruct the jury to articulate the methods and reasons by which it determined that the aggravating circumstances outweigh the mitigating circumstances. See State v. Cook
(1992) 65 Ohio St.3d 516, 525.
Also, under this assignment of error, appellant alleges that the trial court and the jury erroneously took into consideration the nature and circumstances of the offense of the killing of Salman since Salman was shot to the back of his head and neck, execution style. Appellant believes that since the aggravating circumstances concerning the death of Salman was exactly the same as the aggravating circumstances surrounding the death of Al-Turk, and the jury did not apply the death sentence to the murder of Al-Turk, the trial court in its independent review "was required to amend the death recommendation concerning the death of Mr. Salman and impose a life sentence."
Appellant is in error. Clearly, the jury is free to accept and apply the mitigating factors appellant presented as they saw fit. There is no obligation for the jury to give the same weight to the evidence factors presented for each murder.
As noted by appellee, appellant presented mitigating evidence regarding his harsh childhood, and its negative impact upon his impulse control, his ability to control his anger and his inability to set limits. It is within the province of the jury to determine that this lack of control impacted upon the murder of Al-Turk but not the murder of the victim Salman, due to the defendant's claim that he exchanged words with Al-Turk. There is no evidence to reveal any argument or words exchanged with the victim Salman. As a result, the mitigating factors presented by appellant would not apply.
Furthermore, appellant's arguments are directed towards the weight to be given the evidence and the credibility of the witnesses which were matters primarily for the jury sitting as the trier of the facts. Statev. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. "The jury is free to choose among reasonable constructions of evidence." Statev. Jenks (1991), 61 Ohio St.3d 259, 266. "The trier of fact is entitled to believe or disbelieve the testimony of the State's witnesses and/or defense witnesses." State v. Soke (1995), 105 Ohio App.3d 226, 254. The jury can believe all or part of the testimony of any witness. State v.Thomas (1982), 70 Ohio St.2d 79. The jury recommendation was reached pursuant to law; appellant's conclusion that the jury considered the nature and circumstances of the crime as aggravating circumstances is based solely on conjecture.
Accordingly, appellant's fourth assignment of error is without merit.
Appellant's fifth assignment of error states:
 "The trial court erred in admitting certain exhibits in the penalty phase, thereby inviting the jury to consider non-statutory aggravating circumstances. Appellant's death sentence therefore was not reliably determined, U.S. Const. amend. VIII and XIV, Ohio Const. art. I, §§ 1, 2, 9, and 16."
In this assignment of error, appellant argues that the trial court erred in permitting the readmission of certain exhibits, primarily photographs, from the guilt phase of the trial into the mitigation phase. Appellant makes a general assertion that all of the photographs and exhibits introduced were irrelevant as well as repetitive and cumulative in nature. Furthermore, appellant believes these exhibits served solely to inflame the passion of the jury and were therefore prejudicial in nature.
In the case sub judice, appellant was found guilty of aggravated murder in that his actions fulfilled the aggravating circumstances set forth in R.C. 2929.04(A)(5) which states in relevant part:
 "* * * the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender."
In order to have the death penalty imposed, R.C. 2929.04(A) requires that the aggravating circumstance be proven beyond a reasonable doubt. Furthermore, the state has the burden of establishing during the second phase of the trial that the aggravating circumstance outweighed any mitigating factors.
The Ohio Supreme Court has repeatedly cited to its holding in State v.DePew (1988), 38 Ohio St.3d 275, when addressing the appropriateness of introducing evidence and testimony from the guilt phase of the trial into the mitigation phase. The court stated in relevant part in its opinion:
 "Lastly, appellant argues that the trial court erred in submitting all these photographs to the jury in the penalty phase. In his instructions at this stage, the trial judge stated that `[t]he Court is going to place in your possession the exhibits which the Court admitted into evidence during the course of both trials * * *.' Citing [State v. Thompson (1987), 33 Ohio St.3d 1], appellant argues that these photographs were relevant to guilt, not to the appropriate penalty, and that permitting the jury to view the photographs again served no purpose but to inflame their passions against appellant.
 "* * * In fact, we find that the introduction of photographs, even if gruesome, in the penalty stage is not error and is indeed authorized by R.C. 2929.03(D)(1), which provides in part that during the penalty stage, the court and the trial jury shall consider `* * * any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * *.' In addition, this section provides that the court and the trial jury `* * * shall hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing * * *.' (Emphasis added.)
"* * *
 "The courts of this state have been required to wrestle with the question of what evidence is appropriate for the prosecution to introduce at the penalty stage. We now hold that, pursuant to R.C. 2929.03(D)(1), the prosecutor, at the penalty stage of a capital proceeding, may introduce `* * * any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * *.' While this appears to permit repetition of much or all that occurred during the guilt stage, nevertheless, a literal reading of the statute given to us by the General Assembly mandates such a result, especially in light of the prosecution's obligation to demonstrate, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation. R.C. 2929.03(D)(1)." (Emphasis sic and added.) DePew, 38 Ohio St.3d 282-283
The Supreme Court has continued to rely upon this reasoning as is evidenced in State v. Mason (1998), 82 Ohio St.3d 144. The court again determined that a "prosecutor at the penalty phase may introduce any evidence from the guilt phase relevant to the aggravating circumstances."Id. at 165. Similarly, the Supreme Court has held that it is appropriate to admit all exhibits from a trial's guilt phase as such are related to the death specification and the nature and circumstances of the offense.State v. Woodard (1993), 68 Ohio St.3d 70, 78.
The following exhibits were entered into evidence during the mitigation phase of this trial over the objection of the defense: Exhibits 1, 5, 6, 10, 11, 14, 15, 21, 26, 28, 35, 43, 45, 46, 51 through 66, 69, 71, and 76. Thus, out of 77 exhibits from the guilt phase of the trial, 33 were admitted into evidence at the mitigation phase of the trial. Those exhibits are as follows:
1. Exhibit 1: the gun in question.
 2. Exhibit 5: a photo of the front door of Midway Market where the crime occurred.
 3. Exhibit 6: a photo of the "blunt" cigar on the floor of the store.
 4. Exhibit 10: a photo of victim Al-Turk in the position he was found in the store.
 5. Exhibit 11: a photo of victim Salman showing him as he was found beneath the counter under the cash register and lottery machine.
 6. Exhibit 14: a photo from the interior of the store looking out towards the door.
 7. Exhibit 15: a photo of the store's counter from the approximate position of any shooter.
 8. Exhibit 21: a photo of the interior of the store as you would enter the front door.
 9. Exhibit 26: a close-up photo of Salman showing his head wounds.
 10. Exhibit 28: a photo showing both victims as they were found in the store.
11. Exhibit 35: a photo of a bag of marijuana.
12. Exhibit 43: a photo of the x-rays of Salman.
13. Exhibit 45: a photo of the x-rays of Al-Turk.
 14. Exhibit 46: an autopsy photo of Al-Turk showing the "tattooing" of the wound indicating closeness of the shooting.
 15. Exhibits 51 through 60: the bullet casings found at the scene which came from the murder weapon.
 16. Exhibits 61 through 65: vials with the bullets in them which were recovered from the bodies in the crime scene.
 17. Exhibit 65: the gun "magazine" from the murder weapon.
 18. Exhibit 69: the coroner's findings for Salman describing the injuries which caused his death.
 19. Exhibit 71: the coroner's findings for Al-Turk describing the injuries which caused his death.
20. Exhibit 76: Mark Brown's statement.
A review of these exhibits reveals that they all serve to illustrate the nature and circumstances of the aggravating circumstance that appellant was found guilty of committing. As a result, all such exhibits are admissible. As previously discussed, the aggravating circumstance at issue requires that appellant purposefully killed two individuals during the same course of conduct. All information relevant to this circumstance is admissible in order to support the state's argument that the aggravating circumstance outweighs any mitigating factors.
In regards to the photographs of the two victims, these exhibits serve a dual purpose. First, they reveal the cause of death of the individuals. Second, they go to the purposeful element of the aggravating circumstance. By indicating the multiple wounds to the victims, the photographs illustrate appellant's intent to kill both victims. Evidence of this sort has previously been held to be relevant as to the nature and circumstances of the aggravating circumstance. State v. Smith (1997),80 Ohio St.3d 89, 109.
The introduction of the gun, bullets and bullet casings clearly go to the purposeful killing of the victims.
All medical records and pathological evidence contained in the exhibits again goes to support the cause of death of the victims. Furthermore, these exhibits may be used to support the intent of appellant due to the fatal nature of a number of the wounds. Finally, any exhibit related to appellant's confession further supports a finding that appellant acted intentionally in killing the two victims.
Since all exhibits which were objected to clearly relate to the aggravating circumstance as well as the nature and circumstances thereof, it cannot be determined that the trial court erred in permitting the exhibits to be introduced during the mitigation phase of the trial. All exhibits fall within the scope of admissible evidence as established by R.C. 2929.03(D)(1) and the case law interpreting said statute. Therefore, it cannot be held that any of these exhibits served to prejudice appellant. All exhibits were properly introduced to assist the state in meeting its burden regarding the aggravating circumstance.
Accordingly, appellant's fifth assignment of error is without merit.
Appellant's sixth assignment of error states:
 "The Trial Court Erred in Failing to Give a Supplemental Charge to The Coercive Howard Charge, Thus, Depriving Defendant of a Fair Trial, U.S. Const. amend. VI and XIV, Ohio Const. art. I, §§ 1, 2, 10, and 16."
After the jury had been given its instructions by the trial court they began their penalty phase deliberations at about 12:45 p.m. on February 22, 1996. A few miscellaneous questions were asked by the jury that day and they ended their deliberations about 6:30 p.m. On the following day at about 9:00 a.m., the jury continued its deliberations with a break for lunch. At 2:25 p.m., the jury foreman notified the trial court that the jury had agreed on a recommendation on one charge but could not agree on a recommendation on the other. By this time, they had been deliberating for a little over nine hours.
Appellant's trial counsel requested that the trial court give theMartens supplemental charge which refers to the impossibility of reaching a verdict. After some discussion with counsel for each party on whether to give the Martens or the Howard supplemental charge, the trial court gave the Howard charge. Appellant argues that the Howard supplemental charge is unduly coercive in that it does not explain to jurors that they have the option of not reaching a verdict.
The jurors continued deliberating until 9:00 p.m. at which time they were excused. They continued their deliberations the next morning at 10:30 a.m. At about 1:53 p.m., the jury announced that they had reached verdicts on both charges. The jury stated that as to Count 1, the aggravated murder of Salman, they recommended appellant be sentenced to death. On Count 2, the aggravated murder of Al-Turk, they recommended defendant be sentenced to life imprisonment with parole eligibility after serving thirty years. Upon being polled on their verdict, eleven jurors acknowledged agreement with the verdict while one juror stated that she had "compromised" with the other eleven jurors.
At about 4:45 p.m., after additional discussion with counsel for both parties, the trial court gave the original charge to the jury eliminating the Howard charge and refusing to give the requested Martens charge. At 7:23 p.m., the jury announced they had reached a verdict. The verdicts were the same as the original verdict and when polled all twelve jurors agreed with the verdict.
The supplemental charge that the trial court gave was previously approved in State v. Howard (1989), 42 Ohio St.3d 18, paragraph two of the syllabus. The Ohio Supreme Court has repeatedly approved of its use with deadlocked juries. See State v. Dennis (1997), 79 Ohio St.3d 421; Statev. Loza (1994), 71 Ohio St.3d 61.
The appellant relies upon the decisions in State v. Sabbah (1982),13 Ohio App.3d 124, and State v. Martens (1993), 90 Ohio App.3d 338, in arguing that additional instructions were required to inform the jury of its right not to decide the penalty recommendations. Appellant's reliance on these cases is misplaced.
In Sabbah, the jury indicated that it was evenly deadlocked and lacked sufficient evidence to reach a verdict and that any verdict it reached would be unfair. In the case sub judice, the jury stated that they could not reach an agreement on only one recommendation.
Appellant relies on State v. Martens (1993), 90 Ohio App.3d 338, to argue that additional instructions were warranted to inform the jury of their right not to decide the case. That reliance lacks merit however since the court in Martens declined to give the very instruction requested. The appellate court discussed the instruction regarding the impossibility of reaching a verdict and stated that it is only appropriately given "when it appears to the court that the jury after deliberating for a reasonable period of time is unable to reach a verdict." Id. at 343. The court explained that "the instruction changes the focus of the deliberations by asking the jury to decide whether any verdict can be reached through further deliberations." Id. at 343. Though appellant argued initially for this instruction, the trial court in the instant case declined to give it. The rationale for this decision is found in Martens. "If given prematurely the instruction may be contrary to the goal of the Howard charge of encouraging a verdict where one can conscientiously be reached."
"No exact line can be drawn as to how long a jury must deliberate in the penalty phase before a trial court should instruct the jury to limit itself to the life sentence options or take the case away from the jury * * *." State v. Mason (1998), 82 Ohio St.3d 144. Here the trial court acted appropriately by giving the modified Howard charge. The circumstances show that the jury was not irreconcilably deadlocked, and the Howard charge did not coerce a death verdict.
The trial court judge must select and modify jury instructions to fit the particular facts of each case. See Cleveland v. Buckley (1990),67 Ohio App.3d 799. The Ohio Supreme Court has approved using supplemental instructions urging jurors to continue deliberations to try to reach a unanimous penalty verdict. See State v. Tyler (1990),50 Ohio St.3d 24. See, also, State v. Mason (1998), 82 Ohio St.3d 144. Sending just such a supplemental instruction to a jury, considering the death penalty, does not violate due process. Lowenfield v. Phelps
(1988), 484 U.S. 231.
Accordingly, appellant's sixth assignment of error is without merit.
Appellant's seventh assignment of error states:
 "The Court Erred in Failing to Declare a Mistrial, Thus Depriving Defendant of Due Process and His Right to a Fair Trial, U.S. Const. amend. VI and XIV, and Ohio Const. art. I, §§ 1, 2, 10, and 16."
Appellant alleges the trial court erred in failing to declare a mistrial when one juror indicated upon being polled that she did not concur with the verdict and had compromised with the other jurors. Appellant alleges that the court improperly sent the jury back for further deliberations, that the court improperly instructed the jury following the above juror's statement, and finally that the trial court should have inquired of this juror following the jury's verdict after further deliberations.
On February 24, 1996, at approximately 4:35 p.m., the jury informed the trial court that it reached a penalty verdict. A polling of the jury, however, revealed that Juror Ella York, although having signed the verdict form, did not concur orally in the jury's penalty verdict.
"THE COURT: Ella York, are these your verdicts?
 "MS. YORK: Your Honor, I compromise [sic] with the other eleven jurors.
"THE COURT: Are these your verdicts?
"MS. YORK: No, they're not.
"THE COURT: These are not your verdicts?
 "MS. YORK: I compromised, Your Honor, with the other jurors.
 "THE COURT: Okay. Please be seated a minute. * * *" (Transcript of Mitigation Phase, p. 573)
The trial court re-instructed the jury using the original jury instruction and sent them back for further deliberations.
Crim.R. 31(D), which deals with the polling of a jury after receipt of a verdict, provides as follows:
 "When a verdict is returned and before it is accepted the jury shall be polled at the request of any party or upon the court's own motion. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberation or may be discharged."
In addition, R.C. 2945.77 provides as follows:
 "When the jurors agree upon their verdict, they must be conducted into court by the officer having them in charge.
 "Before the verdict is accepted, the jury may be polled at the request of either the prosecuting attorney or the defendant. If one of the jurors upon being polled declares that said verdict is not his verdict, the jury must further deliberate upon the case."
The grant or denial of an order of mistrial lies within the sound discretion of the trial court. State v. Garner (1995), 74 Ohio St.3d 49,59. "In addition, a motion for mistrial can be granted only where the defendant's right to a fair trial has been prejudiced by the complaint of misconduct or irregularity." State v. Green (1990), 67 Ohio App.3d 72,77.
It has been held that a defendant's right to a fair trial was not prejudiced by the fact that one juror indicated, when polled, that she did not agree with the verdict and after further deliberations, the jury returned a unanimous verdict which was properly reflected in a second polling of the jury. Green, 67 Ohio App.3d at 77-78.
This case presents a similar situation. After further deliberations, the jury returned a unanimous verdict which was properly reflected in the second jury polling.
"THE COURT: Ella York, are these your verdicts?
 "MS. YORK: Yes, Your Honor." (Transcript of Mitigation Phase, p. 596)
Concerning appellant's argument that the trial court should have engaged in a deeper inquiry of the dissenting juror, appellant presents no case law, statute, or procedural rule in support. Crim.R. 31(D) and R.C. 2945.88 speak only of sending the jury back for further deliberations. Upon the second polling, the previously dissenting juror expressed no hesitancy in affirming her concurrence with the verdicts.
Based on the foregoing, the trial court did not abuse its discretion in denying appellant's motion for mistrial.
Accordingly, appellant's seventh assignment of error is without merit.
Appellant's eighth assignment of error states:
 "The Cumulative Effect of Errors Denied Appellant a Fair Trial and Due Process; Accordingly, Neither His Convictions Nor Death Sentence May Stand under U.S. Const. amend. XIV and Ohio Const. art. I, §§ 1, 2, 9, 10, and 16."
Appellant cites to eight different examples of supposed error, to wit:
 1. The state did not file a notice of intent to use other acts evidence pursuant to Crim.R. 12(D)(2).
 2. The state intended to poison the jury by use of testimony concerning the movie "Menace to Society."
 3. The state used impermissible "other acts" evidence in the form of testimony by appellant's mother concerning his purported "gang activities."
 4. The state objected to the questioning of Juror York after the penalty verdict.
 5. The state objected to the giving of the Martens
supplemental charge to the jury.
 6. The appellant alleges that the re-reading of the original charge before the jury was returned for additional deliberation was error.
 7. The state objected to the defense counsel's insistence on describing exhibits admitted at mitigation.
 8. The trial court allowed appellant's confession to be admitted into evidence despite a request for counsel and alleged coercion.
Appellant's first allegation is the use of other acts evidence in the form of testimony by Jones that appellant robbed him of the gun used in the murder. The inclusion of this evidence was found not to be error under appellant's second assignment of error.
Next, appellant alleges the state poisoned the jury by use of testimony concerning the movie "Menace to Society." The testimony in question is as follows:
 "Q Was there anything that Mark Brown said while you were playing cards?
 "A That I could recall, it's like seeing the movie "Menace to Society," and wanting to do what the movie did.
 "Q Okay. He told you or said something about seeing the movie "Menace to Society", and he wanted to do what happened in that movie?
"A Yeah.
"MR. JUHASZ: Objection.
"THE COURT: Overruled. Go ahead.
 "Q What did he mean? Did you know what he meant when he said he wanted to do what happened in that movie?
"MR. JUHASZ: Objection.
"MR. MACEJKO: Objection.
"MR. GESSNER: If he knew.
"MR. JUHASZ: How could he?
 "MR. GESSNER: He is the only one that could testify to that, not counsel.
 "MR. MACEJKO: Your Honor, that just calls for speculation on the part of this witness.
 "THE COURT: Yeah. I am going to sustain the objection.
"BY MR. GESSNER.
 "Q Mr. Thomas, did you see the movie "Menace to Society"?
"A Yes.
 "Q Will you tell the jury what this defendant said with regard to that movie?
 "MR. JUHASZ: Objection. He has already testified; that's asked and answered.
"THE COURT: I'll overrule the objection.
 "Q What did Mark Brown say with regard to the movie "Menace to Society"?
"A What they did at the beginning of the movie.
 "Q Okay. And you saw that movie. What did they do at the beginning of that movie?
 "A They went in an Oriental store and killed two Orientals.
 "Q And did they do anything else besides killing the two Oriental store clerks?
"A In the movie?
"Q Yes.
"A Yeah, they took the money.
 "Q They took the money. All right. After Mark Brown said he wanted to go in or he wanted to do what they did in the movie "Menace to Society", did you keep playing cards?
"A Yeah." (Tr. 107-109)
The trial court correctly admitted testimony as to appellant's statements regarding this movie since those statements could be determined to point to his intent and motives upon re-entering the store on the night of the killings.
Next, appellant alleges the court impermissibly allowed testimony by appellant's mother concerning appellant's possible gang affiliation. As noted under appellant's second assignment of error, the testimony by appellant's mother does not constitute impermissible other acts testimony as defined in Evid.R. 404(B).
Next, appellant alleges that the trial court erred by not questioning Juror York after the verdict. This was not found to be an error under appellant's seventh assignment of error. As previously noted, there was no obligation to inquire further of Juror York after further deliberations since she expressed no hesitancy or uncertainty in her verdict when polled the second time. The refusal to inquire further of this juror was within the sound discretion of the trial court.
Next, the appellant attacks the prosecution's objection to a Martens
supplemental charge to the jury. As noted under appellant's sixth assignment of error, the Martens charge was not required to be given to the jury by the trial court. The refusal to give this charge to the jury was within the discretion of the trial court.
Next, appellant alleges the re-reading of the original charge was in error. Appellant has failed to point to any law or case that holds a judge should not recharge a jury when ordering them to continue deliberations. This point by appellant was found to be without merit under appellant's sixth assignment of error.
Next, appellant alleges the state objected to defense counsel's describing exhibits admitted at mitigation. All of the exhibits were described by the parties and none of the exhibits were admitted without a complete description thereof.
Finally, appellant alleges that the trial court erred in admitting appellant's confession. This allegation was disposed of under appellant's first assignment of error and found to be without merit.
Considering all eight issues raised by appellant in this assignment of error, one was found to be harmless error, while all the others were found to be without merit.
It is well settled that the cumulative error doctrine is not applicable if multiple examples of error are not present throughout the trial. Statev. Garner (1995), 74 Ohio St.3d 49, 64. Errors that are harmless or nonprejudicial cumulatively as well as individually will not invoke the doctrine of cumulative error. State v. Goff (1998), 82 Ohio St.3d 123,140.
Accordingly, appellant's eighth assignment of error is without merit.
Appellant's ninth assignment of error states:
 "The trial court erred in failing to dismiss the death specifications, and in imposing the death sentence for the death of Isam Salman. A reviewing court may not compare death sentences only with other death sentences and still follow the constitutional demands for a proportionality review, nor may a reviewing court conduct a meaningful proportionality review without sufficient data on jurors' rationale for choosing a life sentence over the death penalty, for to do so violates the guarantees of U.S. Const. amend. VIII and XIV; Ohio Const. art. I, §§ 1 and 9."
Appellant argues that Ohio's scheme of comparing capital cases only with other cases where a death sentence was actually imposed is not a fair proportionality review since it does not permit the courts to make a principled distinction between cases where death is imposed and those where it is not.
Appellant's argument rests upon the premise that a proportionality review is constitutionally mandated in cases involving the imposition of a death sentence. However, in Pulley v. Harris (1984), 465 U.S. 37,44-45, the United States Supreme Court noted:
 "[T]hat some schemes providing proportionality review are constitutional does not mean that such review is indispensable. * * * Examination of our 1976 cases makes clear that they do not establish proportionality review as a constitutional requirement."
Additionally, in State v. Vrabel (Mar. 2, 2000), Mahoning App. No. 95 CA 221, unreported, 2000 WL 246482 at *14, this court observed:
 "Since a proportionality review is not constitutionally required, Ohio is free to define the scope of any proportionality review that is adopted. State v. Bedford
(1988), 39 Ohio St.3d 122. The proportionality review that has been employed as part of Ohio's overall death penalty system is codified in R.C. § 2929.05. The purpose behind the proportionality review is to ensure that the sentencing authorities do not impose the death penalty in a capricious or arbitrary fashion. State v. Jenkins (1984), 15 Ohio St.3d 164, 176. Appellant challenges the manner in which that review is undertaken by arguing that a reviewing court must look outside of its district to other capital cases to examine the proportionality of the sentence in the case before it.
 "The Ohio Supreme Court has already spoken on this precise issue. In State v. Steffen (1987), 31 Ohio St.3d 111, 123, the Court held:
 "`that the proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed. Thus, a court of appeals need only compare the case before it with other cases actually passed on by that court to determine whether the death sentence is excessive or disproportionate."
Appellant next argues that Ohio's proportionality review is fatally defective because R.C. 2929.03 does not require a jury, when recommending life imprisonment at the penalty phase, to list the mitigating factors it considered in support of its sentencing recommendation. Appellant maintains that by failing to require some statement from the jury as to the mitigating factors found, a meaningful proportionality review is impossible. The Ohio Supreme Court addressed this argument in Jenkins as follows:
 "The question remains whether the absence of a requirement that juries specify the mitigating factors which they found to exist, and why these factors outweigh aggravating circumstances, creates a fatal defect in the statutes. We hold that it does not." Jenkins, 15 Ohio St.3d at 176. (Emphasis added); see, also, State v. Hill (1996), 75 Ohio St.3d 195; State v. Davis (1991), 62 Ohio St.3d 326 (holding that the present scheme of proportionality review is constitutionally sound).
Appellant asserts that additional data is required for there to be a constitutionally adequate comparison of death penalty cases. This argument focuses upon what is viewed as a lack of information to perform a meaningful review and comparison.
The death penalty statute's proportionality review provision is not unconstitutional when the court reviews only cases where the death penalty was sought. Review need not encompass cases where the death penalty was not sought but could have been sought. See State v. Green
(1993), 66 Ohio St.3d 141. Also, the proportionality review mandated by R.C. 2929.05(A) does not require a review of those cases in which a sentence of life imprisonment is imposed rather than the death sentence. See State v. Davis (1992), 63 Ohio St.3d 44. It is also clear that proportionality review is restricted to those cases already decided by the reviewing court in which the death penalty has been imposed. See Statev. Steffen (1987), 31 Ohio St.3d 111. Furthermore, the Ohio Supreme Court has previously determined on numerous occasions that the scheme established to review and compare death penalty cases is sufficient and constitutional. State v. Moore (1998), 81 Ohio St.3d 22, 39; State v.Davie (1997), 80 Ohio St.3d 311, 328; State v. Benner (1988),40 Ohio St.3d 301, 318. Therefore, this argument is meritless.
Accordingly, appellant's ninth assignment of error is without merit.
Appellant's tenth assignment of error states:
 "The Trial Court Erred in Overruling Appellant's Motion to Dismiss, T.d. 20, T.d. 236 Because the Ohio Capital Laws, Both as Enacted and as Interpreted, Deny a Capital Defendant Meaningful Appellate Review, an Indispensable Ingredient in Imposing a Death Sentence Consistent with U.S. Const. amend. VIII and XIV and Ohio Const. art. I, §§ 1, 2, 9, and 16."
Appellant alleges the trial court erred in overruling appellant's motion to dismiss since Ohio's capital laws deny appellant a meaningful appellate review. More specifically, appellant alleges that Ohio's appellate review is inadequate because improper limits are placed upon mitigation evidence causing a denial of effective mitigation arguments. On this point, appellant cites to a lack of a "mercy" instruction to the jury. Appellant next alleges a lack of meaningful proportionality review. On this issue appellant feels that Ohio's proportionality review perpetrates past mistakes and alleges the courts find a way to affirm death sentences for reasons not related to the capital laws. Finally, appellant alleges that the court's independent weighing of aggravating circumstances and mitigating factors is inexplicable. On this point, appellant alleges the court allows the use of nonstatutory aggravating circumstances by weighing the manner of the killing which is not an aggravating circumstance against the mitigating factors.
In appellant's first point, concerning mitigating evidence, he overlooks that R.C. 2929.04(B)(7) provides for the presentation of evidence relating to "any other factors that are relevant to the issue of whether the offender should be sentenced to death." In addition, R.C.2929.04(C) states in pertinent part that "the defendant shall be given great latitude in a presentation of evidence of the factors listed in division (B) of this Section and of any other factors in mitigation of the imposition of the sentence of death."
Appellant's arguments concerning the requirement of a mercy instruction to the jury is without merit. (See appellant's eleventh assignment of error).
In appellant's second and third points, he argues that the proportionality review conducted and the independent weighing of aggravating circumstances and mitigating factors are inadequate. Despite the appellant's argument regarding constitutional challenges to the system of appellate review, the Ohio Supreme Court has stated "the current system of appellate review has been ruled constitutional." Statev. Green (1993), 66 Ohio St.3d 141, 151; see, also, State v. Buell
(1986), 22 Ohio St.3d 124. In direct contrast to the appellant's argument that non-capital cases must be included in any review, the Ohio Supreme Court has held "R.C. 2929.05 does not require a comparison of sentences in noncapital murder cases for proportionality review nor is a similar requirement imposed by the United States Constitution." State v. Steffen
(1987), 31 Ohio St.3d 111, 123.
While Brown argues that capital sentencing is not evenly applied, the Ohio Supreme Court has rejected such contentions. State v. Jenkins,15 Ohio St.3d 164, 170.
Accordingly, appellant's tenth assignment of error is without merit.
Appellant's eleventh assignment of error states:
 "The Trial Court Erred in Refusing a Mercy Instruction. The Preclusion of a Mercy Instruction Prohibits Trial Juries from Recommending Life Sentences Where the Aggravating Circumstances Outweigh the Mitigating Factors, but the Jurors Nonetheless Conclude That the Death Sentence Is Not Appropriate; Therefore, Ohio's Death Penalty, with its Mandatory Death Sentences under Certain Circumstances Violate the State and Federal Constitutions. Ohio Const. art. I, §§ 1, 2, 9, 16; U.S. Const. amend. VIII and XIV."
Under this assignment of error, appellant argues that the trial court erred in refusing a "mercy" instruction. The Ohio Supreme Court rejected this argument in State v. Lorraine (1993), 66 Ohio St.3d 414. In that case, the Court stated:
 "Appellant in his second proposition of law contends that he was denied a fair trial because the trial court refused to instruct the jury concerning mercy and prohibited him from asking the jury to err on the side of mercy.
 "This court has previously considered a similar issue. We held in State v. Jenkins (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph three of the syllabus:
 "`The instruction to the jury in the penalty phase of a capital prosecution to exclude consideration of bias, sympathy or prejudice is intended to insure that the sentencing decision is based upon a consideration of the reviewable guidelines fixed by statute as opposed to the individual juror's personal biases or sympathies.'
"* * *
 "Permitting a jury to consider mercy, which is not a mitigating factor and thus irrelevant to sentencing, would violate the well-established principle that the death penalty must not be administered in an arbitrary, capricious or unpredictable manner. [California v. Brown (1987), 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934, 939]; Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; Furman v. Georgia (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. The arbitrary result which may occur from a jury's consideration of mercy is the exact reason the General Assembly established the procedure now used in Ohio.
 "R.C. 2929.03(D)(2) provides that `[i]f the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender.' (Emphasis added.) This statutory requirement eliminates the subjective state of mind the issue of mercy generally adds to a jury's deliberation.
 "Mercy, like bias, prejudice, and sympathy, is irrelevant to the duty of the jurors. Appellant's counsel therefore was not allowed to plead for mercy, although he was permitted to plead for appellant's life based upon the statutory mitigating factors. Accordingly, this proposition is not well taken." Lorraine, 66 Ohio St.3d at 417-418.
In State v. Vrabel (Mar. 2, 2000), Mahoning App. No. 95 CA 221, unreported, 2000 WL 246482 at *17, this court observed:
 "Thus, permitting a jury to consider mercy, which is not a mitigating factor pursuant to the statute, would result in unpredictable and arbitrary impositions of the death penalty. [State v. Lorraine (1993), 66 Ohio St.3d 414, 417], citing California v. Brown
(1987), 479 U.S. 538, 541. The arbitrary result which would occur by allowing consideration of such an amorphous non-statutory factor is precisely what the General Assembly sought to prevent when it established the framework currently in place. Id. Likewise, the arbitrary imposition of a death sentence is exactly what Appellant rails against in this assignment of error."
Accordingly, appellant's eleventh assignment of error is without merit.
Appellant's twelfth assignment of error states:
 "The Trial Court Erred in Failing to Dismiss the Death Specifications Because the Ohio Death Penalty Law Involves an Excessive and Imprecise Use of Government Power So as to Encroach upon the `Inalienable' Liberties Specified in the Ohio Constitution; Ohio Const. art. I, §§ 1, 2, 9, 10, 16, and 20."
Appellant proposes that the Ohio state courts are free to construe its constitution as providing broader individual liberties than those provided under the federal constitution. Appellant urges this court to provide greater protection for this defendant than has previously been granted by this court and the Ohio Supreme Court to other death penalty defendants.
In his first argument, appellant alleges that the use of a death-qualified jury (i.e. one jury to determine both guilt and penalty) violates his right to a fair and impartial jury, as well as his right to effective assistance of counsel. Next, appellant alleges that the death penalty is "cruel and unusual" punishment in that it is not predictably and reliably imposed, not the least restrictive method, and inflicts unwarranted pain and suffering. Finally, appellant alleges that to "death qualify" a jury denies a defendant of due process.
Appellant's first argument, concerning the use of a death qualified jury, was addressed and rejected by the Ohio Supreme Court in State v.Mapes (1985), 19 Ohio St.3d 108. The court stated, in part:
 "Appellant also argues that the use of the same jury at the guilt and penalty phases of his trial violated his right to trial by a fair and impartial jury and his right of effective assistance of counsel. Appellant argues that the jury did not fairly and impartially view him during the penalty phase because it had convicted him during the guilt phase and that appellant's counsel was not effective during the penalty phase for the same reason. These arguments were also rejected in State v. Jenkins where we stated:
 "`Appellant also submits that since the same jury which convicted him also sentenced him, he was denied a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, as well as Sections 10 and 16, Article I of the Ohio Constitution. Appellant illustrates this contention by arguing that if defense counsel pursues a defense at the guilt phase of a capital trial which affects defendant's credibility, then his credibility is diminished at the sentencing stage. Suffice it to say that although the Supreme Court has endorsed bifurcated proceedings in death penalty cases, see Zant v. Stephens, * * * [(1983), 462 U.S. 862, 874, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235] at 248, the court has yet to even remotely suggest that the Constitution requires a new jury be selected for the sentencing phase. Accordingly, we are unable to accept appellant's contention.' Id. 15 Ohio St. at 173-174, fn. 11, 473 N.E.2d 264, fn. 11." Mapes, 19 Ohio St.3d at 117
Thus, the Ohio Supreme Court has rejected the premise that the constitution requires a new jury be selected for the sentencing phase of the trial. See, also, State v. Maurer (1984), 15 Ohio St.3d 239. We therefore similarly hold that appellant is not denied effective assistance of counsel when counsel is required to talk about the death penalty during voir dire. As was found in Jenkins, Maurer, and Mapes, Ohio courts have not been swayed by the argument that a jury will view counsel as less credible in the event he is forced to present both the guilt and the sentencing phase to one jury or is required to discuss the death penalty prior to the presentation of any evidence.
Appellant's next allegation that the death penalty is "cruel and unusual" punishment has been addressed and rejected by the Ohio Supreme Court in State v. Jenkins (1984), 15 Ohio St.3d 164. The court stated:
 "Appellant's `least restrictive' argument, however, was rejected over eight years ago when the United States Supreme Court released its decisions in Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; Proffitt v. Florida (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; Jurek v. Texas (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929]; Woodson v. North Carolina (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944; and Roberts v. Louisiana
(1976), 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974.
 "In Gregg, supra, the court stated that `* * * the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.' The Supreme Court stated that the death penalty `* * * is an extreme sanction, suitable to the most extreme of crimes.' Appellant's argument is predicated upon societal protection, while the Supreme Court has recognized that the death penalty, as a sanction or punishment, is proper in extreme cases.
 "Alternatively, appellant argues that the death penalty violates the prohibition under the Eighth Amendment against cruel and unusual punishment and is therefore per se unconstitutional. We disagree. Clearly, any vitality which this argument may have had at the time of Furman v. Georgia (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 was rejected in Gregg and its companion cases when the high court stated:
 "`We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it.'
 "Moreover, since the decision in Gregg, the recurring theme has been that states may constitutionally impose the sentence of death as long as the discretion of the sentencing authority is `suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action' in imposing the sentence. Zant v. Stephens (1983), 462 U.S. 862, at ___, 103 S.Ct. 2733, at 2741, 77 L.Ed.2d 235, at 248. The Supreme Court has stressed the necessity of `genuinely narrow[ing] the class of persons eligible for the death penalty,' id. 462 U.S. at ___, 103 S.Ct. at 2741, 77 L.Ed.2d at 249, while requiring the capital sentencing procedure guide and focus `the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death.' Jurek, supra, 428 U.S. at 273-274, 96 S.Ct. at 2957. With these principles in mind, appellant's argument, which requests the erection of a per se rule against the death penalty, must be rejected." (Footnote omitted.) Jenkins, 15 Ohio St.3d at 168-169
Appellant's final argument that to "death qualify" a jury denies a defendant of due process is also without merit. This issue was also fully addressed and rejected by the Ohio Supreme Court in State v. Mapes
(1985), 19 Ohio St.3d 108. The court stated:
 "R.C. 2945.25(C) permits challenge for cause in a capital case if a venireman `unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case.' This statute finds its origin in Witherspoon v. Illinois (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, wherein the Supreme Court stated that prospective jurors may be excluded for cause when it is unmistakably clear that they will automatically vote against the death penalty without regard to the evidence or that their attitudes toward the death penalty will prevent them from making an impartial decision. Appellant argues that the process of `death-qualifying' jurors that sit for the guilt phase of a capital trial violates the rights of equal protection and due process because such jurors are not representative of a fair cross-section of the community and are conviction prone.
 "This argument was addressed in State v. Jenkins, supra, in which we noted that the United States Supreme Court has never required separate juries for the guilt and penalty phases of a capital trial. In Jenkins, this court relied on Keeten v. Garrison
(C.A. 4, 1984), 742 F.2d 129; Adams v. Texas (1980), 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581; and Smith v. Balkcom (C.A. 5, 1981), 660 F.2d 573, certiorari denied (1982), 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148, in holding at 188 that `death-qualify[ing] a jury prior to the guilt phase of a bifurcated capital prosecution does not deny a capital defendant a trial by an impartial jury.' This holding controls this issue as raised in this case." (Footnotes omitted.) Mapes, 19 Ohio St.3d at 116-117
Appellant's contention that death-qualifying jurors denies him an impartial jury composed of a fair cross-section of the community can also be disposed of by looking to Jenkins and Maurer. The Ohio Supreme Court has previously held that "[t]o death-qualify a jury prior to the guilt phase of a bifurcated capital prosecution does not deny a capital defendant a trial by an impartial jury." Maurer, 15 Ohio St.3d at 244, quoting Jenkins, 15 Ohio St.3d at paragraph two of the syllabus.
Accordingly, appellant's twelfth assignment of error is without merit.
Appellant's thirteenth assignment of error states:
 "The Trial Court Erred in Failing to Dismiss the Death Specifications. Ohio's Death Penalty Law, Ohio Rev. Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05, Violates U.S. Const. amend. V, VI, VIII, and XIV and the Immunities Specified in Ohio Const., art. I, §§ 1, 2, 5, 9, 10, and 16."
Specifically, appellant alleges he was denied due process in his conviction since the United States Constitution and the Ohio Constitution prohibit cruel and unusual punishment. Appellant alleges that the death penalty laws:
 1. Are not the least restrictive means to further a compelling government interest.
 2. Do not allow retribution since retribution does not fulfill a compelling government interest.
3. Are discriminatory on a racial basis.
4. Allow unbridled charging discretion by the state.
Appellant's arguments that the death penalty is not the least restrictive means to achieve compelling state interest and that the death penalty is impermissible retribution was rejected by the Ohio Supreme Court inState v. Jenkins (1984), 15 Ohio St.3d 164. The court held:
 "Appellant's `least restrictive' argument, however, was rejected over eight years ago when the United States Supreme Court released its decisions in Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; Proffitt v. Florida (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; Jurek v. Texas (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929]; Woodson v. North Carolina (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944; and Roberts v. Louisiana
(1976), 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974.
 "In Gregg, supra, the court stated that `* * * the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.' The Supreme Court stated that the death penalty `* * * is an extreme sanction, suitable to the most extreme of crimes.' Appellant's argument is predicated upon societal protection, while the Supreme Court has recognized that the death penalty, as a sanction or punishment, is proper in extreme cases." (Footnote omitted.) Jenkins, 15 Ohio St.3d at 168
Next, appellant alleges that the death penalty laws in effect in Ohio are discriminatory in that capital punishment has been applied in a racially discriminatory manner as to both the race of the victim and the defendant. Appellant goes on to cite various statistics to support his argument. The Ohio Supreme Court rejected similar arguments in State v.Zuern (1987), 32 Ohio St.3d 56 . The court noted:
 "The United States Supreme Court has recently resolved this issue in McCleskey v. Kemp (1987), 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262. In that case a complete multiple regression analysis was presented on behalf of the defendant who was a black male convicted, apparently upon strong circumstantial evidence, of killing a white police officer during a robbery. The study examined all murder cases in Georgia during the 1970s and concluded that `black defendants * * * who kill white victims have the greatest likelihood of receiving the death penalty.' (Emphasis added.) Id. 481 U.S. at ___, 107 S.Ct. at 1764, 95 L.Ed.2d at 275. Asserting at 481 U.S. at ___, 107 S.Ct. at 1766, 95 L.Ed.2d 278 that `a criminal defendant must prove that the purposeful discrimination "had a discriminatory effect" on him, Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985),' the court concluded 481 U.S. at ___, 107 S.Ct. at 1769, 95 L.Ed.2d at 281-282 that the statistical study was insufficient to prove in a criminal case that race was a factor in any particular murder prosecution, including that of McCleskey. Furthermore, the court expressly upheld the need for sentencing discretion and essentially stated that the standards enunciated in Furman v. Georgia
(1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, and Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, `necessarily require * * * discretionary judgments.' Id. 481 U.S. at ___, 107 S.Ct. at 1769, 95 L.Ed.2d at 281. It was found that the above study fell far short, and at best only demonstrated a risk that the factor of race may have entered into some capital sentencing. Id. 481 U.S. at ___, fn. 7, 107 S.Ct. at 1766, fn. 7, 95 L.Ed.2d at 277, fn. 7." Zuern, 32 Ohio St.3d at 64-65
The court held "[t]here can be no finding that the death penalty is imposed in a discriminatory fashion absent a demonstration of specific discriminatory intent." Zuern, 32 Ohio St.3d at the syllabus. In the instant case, appellant has not shown in his brief, nor is it evident from a reading of the record in this case, any specific discriminatory intent.
Finally, appellant's allegation that Ohio's death penalty scheme is unconstitutional as it permits unbridled discretion by prosecutors in indictment decisions was addressed and rejected by this court in Statev. Gerish (Apr. 22, 1999), Mahoning App. No. 92 C.A. 85, unreported, 1999 WL 238943. This court noted:
 "Appellant's argument that Ohio's death penalty law provides no control over the prosecutor's charging discretion and that capital indictments are arbitrarily issued was also addressed by the Ohio Supreme Court in Jenkins. This decision again relies upon the reasoning in Gregg for its determination that appellant's argument has no merit.
 "The relevant portion of the Gregg decision quoted by the Ohio Supreme Court states as follows:
 "`First, the petitioner focuses on the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law. He notes that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them.
"`* * *
 "`Petitioner's argument that prosecutors behave in a standardless fashion in deciding which cases to try as capital felonies is unsupported by any facts. Petitioner simply asserts that since prosecutors have the power not to charge capital felonies they will exercise that power in a standardless fashion. This is untenable. Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence. Thus defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong. This does not cause the system to be standardless any more than the jury's decision to impose life imprisonment on a defendant whose crime is deemed insufficiently serious or its decision to acquit someone who is probably guilty but whose guilt is not established beyond a reasonable doubt. Thus the prosecutor's charging decisions are unlikely to have removed from the sample of cases considered by the Georgia Supreme Court any which are truly "similar." If the cases really were "similar" in relevant respects, it is unlikely that prosecutors would fail to prosecute them as capital cases; and I am unwilling to assume the contrary. Id. at 225.
 "`Moreover, as recognized by Justice White in his concurring opinion in Gregg, appellant's argument represents an indictment of our entire criminal justice system which must be constitutionally rejected.' Jenkins, supra at 169-170, 473 N.E.2d 264." Gerish, 1999 WL 238943 at *16-*17
Furthermore, the argument that uncontrolled discretion of prosecutors in indictment decisions allows for arbitrary and discriminatory imposition of the death penalty has specifically been rejected by this court in State v. Hudson (May 28, 1993), Jefferson App. No. 88-J-40, unreported, 1993 WL 181334 (reversed on other grounds).
Accordingly, appellant's thirteenth assignment of error is without merit.
Appellant's fourteenth assignment of error states:
 "The Trial Court Erred in Failing to Dismiss the Death Specifications, Because The Death Penalty Violates U.S. Const. amend. VIII and XIV and Ohio Const. art. I, §§ 1, 2, 9 and 16 Since the Methods of Execution Violate Evolving Standards of Human Decency, an Integral Part of Due Process."
In this assignment of error, appellant alleges that death by electrocution or by lethal injection are both cruel and unusual punishment in that they are disproportionate, excessive and a needless imposition of pain and suffering. Appellant goes on to assert that evolving standards of decency require the barring of electrocution as unnecessary and wanton infliction of pain, citing various instances involving supposed execution "foul-ups".
Similar arguments were addressed and rejected by this court in Statev. Vrabel (Mar. 2, 2000), Mahoning App. No. 95 CA 221, unreported, 2000 WL 246482 at *29, wherein we noted:
 "This question, however, has also already been decided by the Ohio Supreme Court. In State v. Coleman (1989) 45 Ohio St.3d 298, 308, the Court stated, `The death penalty by means of electrocution is not cruel and unusual punishment.' See e.g., State v. Brooks
(1986), 25 Ohio St.3d 144; State v. Buell (1986), 22 Ohio St.3d 124; State v. Jenkins (1984), 15 Ohio St.3d 164. See also, State v. Bayless (1976), 48 Ohio St.2d 73 (holding that the sentence of death by electrocution, for the crime of aggravated murder, does not violate the prohibition of the United States Constitution against cruel and unusual punishment).
 "As correctly observed by Appellant, Ohio law now provides a defendant sentenced to death with an opportunity to elect to be executed by means of lethal injection rather than the electric chair. R.C. § 2949.22. Appellant notes that the Ohio Supreme Court has not specifically ruled on the constitutionality of this particular means of execution and invites this Court to now rule that R.C. § 2949.22 violates the state and federal prohibitions against cruel and unusual punishment. We must decline to so rule, as we are already bound by Ohio law to find that one of the means of death which can be elected by a defendant is constitutional."
Accordingly, appellant's fourteenth assignment is without merit.
Appellant's fifteenth assignment of error states:
 "The Trial Court Erred in Failing to Dismiss the Death Specifications. The Death Penalty Violates the United States and Ohio Constitutions Because the Irrevocable Nature of the Penalty Makes it Impossible to Cure Errors, Including Actual Innocence."
Appellant alleges the trial court erred in failing to dismiss the death penalty because the irrevocable nature of the penalty makes it impossible to cure any possible errors, including the possibility of innocence. Appellant goes on to cite various examples where convicted murders on "death row" were later found to be not guilty of the crimes charged.
Given the overwhelming evidence of appellant's guilt, including his own confession, appellant's concern about the possibility of actual innocence is somewhat disingenuous. Despite the irrevocable nature of the death penalty, the Ohio Supreme Court has found Ohio's death penalty statute to be constitutional "in all respects." State v. Bey (1999),85 Ohio St.3d 487, 502; State v. Evans (1992), 63 Ohio St.3d 231, 253. InState v. Steffen (1994), 70 Ohio St.3d 399, 406-407, the court observed:
 "Ohio's present death penalty statute was enacted in 1981, following the United States Supreme Court's decision in Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859. Convicted persons have engaged in sometimes ingenious, sometimes frivolous courses of conduct that have successfully thwarted imposition of the death sentence. The judiciary has participated in this endeavor by adhering to procedures intended to ensure that every effort is made to protect due process and to determine guilt.
 "Herein lies the internal conflict that death row inmates have seized upon and used to their advantage. We, as a society, are justifiably tentative about imposing death as a punishment for crimes. Having assumed the power to take life, we have striven for a level of assurance in our decisions that is probably not humanly possible. We have created a web of procedures so involved that they threaten to engulf the penalty itself. We arrive at a point, however, where greater certitude is not reasonably possible. There comes a time where the possibility that something else can be discovered approaches the vanishing point. Then we must end our inquiry and act upon the conclusion we have reached. Procrastination will not satisfy the soul."
Accordingly, appellant's fifteenth assignment of error is without merit.
 INDEPENDENT REVIEW
R.C. 2929.05(A) provides that after an appellate court has reviewed and analyzed a death penalty judgment in the same manner as it would a judgment in any other type of criminal case, the court is further required to independently review the evidence presented at trial and determine if the imposition of the death penalty was warranted. As such, we will now proceed with said independent review to determine if the imposition of the death penalty was warranted.
Under R.C. 2929.05(A), an appellate court's independent review of the imposition of the death penalty involves a three-step process. First, we must review the record to determine whether the evidence supports the finding that the aggravating circumstance was established beyond a reasonable doubt. Second, we must re-weigh all the evidence presented at trial to determine if the aggravating circumstance outweighs the mitigating factors. Third, we are required to decide if the imposition of the death penalty in this case was disproportionate or excessive in comparison to other cases in which the death penalty has previously been imposed.
In addressing the first step of our independent review, we note that the sole specification under each aggravated murder count charged appellant with the aggravating circumstance delineated in R.C.2929.04(A)(5). Under this section of the Ohio Revised Code, criteria are defined which must be met prior to imposing the death penalty for aggravated murder. The statute states in relevant part:
 "(A) Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:
"* * *
 "(5) Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender."
Appellant in this case was found guilty of Count 1 and Specifications 1 and 3 to Count 1, along with Count 2 and Specifications 1 and 3 to Count 2. In the penalty phase of the trial the jury recommended the sentence of death on Count 1 and a sentence of life on Count 2. The jury acquitted appellant of all the other charges in the indictment.
The relevant indictments in this case read:
"COUNT ONE
 "The Jurors of the Grand Jury of the State of Ohio, within and for the body of the County of Mahoning, on their oaths, and in the name and by the authority of the State of Ohio, do find and present that on or about the 28th day of January, 1994, at Mahoning County, MARK A. BROWN did purposely and with prior calculation and design, caused the death of Isam Salman. In violation of Ohio Revised Code Section 2903.01(A)(C), against the peace and dignity of the State of Ohio.
"SPECIFICATION ONE TO COUNT ONE
 "The Grand Jury further finds and specifies that the offense at bar was part of a course of conduct involving the purposeful killing of, or attempt to kill, two or more persons by MARK A. BROWN, contrary to R.C. 2929.04(A)(5).
"SPECIFICATION THREE TO COUNT ONE
 "The Grand Jury further finds and specifies that the said MARK A. BROWN had a firearm on or about his person or under his control while committing the offense, contrary to and in violation of R.C. Sections 2941.141
and 2929.71(A).
"COUNT TWO
 "The Jurors of the Grand Jury of the State of Ohio, within and for the body of the County of Mahoning, on their oaths, and in the name and by the authority of the State of Ohio, do find and present that on or about the 28th day of January, 1994, at Mahoning County, MARK A. BROWN did purposely and with prior calculation and design, caused the death of Hayder A. Turk. In violation of Ohio Revised Code Section 2903.01(A)(C), against the peace and dignity of the State of Ohio.
"SPECIFICATION ONE TO COUNT TWO
 "The Grand Jury further finds and specifies that the offense at bar was part of a course of conduct involving the purposeful killing of, or attempt to kill, two or more persons by MARK A. BROWN, contrary to R.C. 2929.04(A)(5).
"SPECIFICATION THREE TO COUNT TWO
 "The Grand Jury further finds and specifies that the said MARK A. BROWN had a firearm on or about his person or under his control while committing the offense, contrary to an in violation of R.C. Sections 2941.141
and 2929.71(A)."
As defined under R.C. 2901.22, an individual acts with purpose when he acts with a "specific intention to cause a certain result." The voluntariness of appellant's actions, his statements to police, and his demeanor during, as well as following the incident, supported a finding that appellant acted purposely in killing both victims. No evidence supports a finding that appellant acted on an impulse or that the killings were the result of an instantaneous eruption of events. Appellant's actions and statements in conjunction with the manner in which he killed both victims indicates he acted with purpose. Therefore, it must be held that the evidence supports beyond a reasonable doubt a finding that appellant did purposefully murder Isam Salman and Haydee Al-Turk as part of a course of conduct as provided for in R.C.2929.04(A)(5).
In this case, appellant has admitted that he shot and killed Al-Turk while alleging that he did not remember shooting Salman. (Tr. 700). After the shooting he left the scene and witnesses observed him wipe off the gun. (Tr. 242-244). Prior to going to the Market, appellant had made statements concerning a movie where the main character went into a store, stole money, and killed two men in the store. Further, there was testimony that appellant was heard to say that he wanted to do what the character in the movie had done. (Tr. 111). This evidence, if believed by the trier of fact, would tend to prove that appellant did not act on an impulse or that the killings were not the result of an instantaneous eruption of events. There was further testimony that appellant had a "bandana" around his neck (Tr. 165) and used this blue bandana as a mask when he entered the store. (Tr. 240). If believed by the jury, this testimony would lead them to believe appellant did not re-enter the store to purchase cigars.
Also, appellant admitted that the gun found on him when he was arrested was his. This weapon was later found to be the murder weapon by the ballistics testing.
Having determined that the aggravating circumstance was established beyond a reasonable doubt, this court now turns its focus to the second step of its independent review. We must now determine whether the aggravating circumstance outweighs any mitigating factors established by appellant. R.C. 2929.04(B) sets forth a specific list of factors which must be considered in favor of the defendant if they are proven by the evidence:
 "(1) Whether the victim of the offense induced or facilitated it;
 "(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion or strong provocation;
 "(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;
"(4) The youth of the offender;
 "(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;
 "(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;
 "(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."
In addition to the foregoing factors, R.C. 2929.04(B) provides that the history, character, and background of the defendant can be weighed against the aggravating circumstance along with the nature and circumstances of the offense. However, in relation to the latter consideration, an appellate court is not always required to consider the nature and circumstances of the offense in favor of the defendant. The Ohio Supreme Court has held that, when the facts of a specific case so warrant, the nature and circumstances of the offense can be cited as supporting the finding that the aggravating circumstance outweighs the mitigating factors. State v. Moreland (1990), 50 Ohio St.3d 58, 69. Furthermore, the trial court need not give mitigating weight to an offender's history, background, and character if it finds said factors do not warrant such weight. State v. Green (1993), 66 Ohio St.3d 141, 150.
We are mindful that only the aggravating circumstances may be weighed against the mitigating circumstances. State v. Davis (1988),38 Ohio St.3d 361, 367-373. Further, the mitigating circumstances must be considered collectively, State v. Dickerson (1989), 45 Ohio St.3d 206,213, and all mitigating evidence must be considered. State v. Lawrence
(1989), 44 Ohio St.3d 24, 27.
Based on our review of the record, factors one, two, three, four, five, and six are inapplicable to the instant action. There was no evidence introduced that either victim induced or facilitated these murders; aside from self-serving testimony of appellant that, "he's reaching for something and I panicked and shot." (Tr. 997). R.C.2929.04(B)(1). Also, there was no evidence submitted to show that the appellant was under duress, coercion, or strong provocation at the time of the killings. R.C. 2929.04(B)(2). There was no evidence introduced to indicate that appellant, at the time of the crimes, suffered from a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the law. R.C.2929.04(B)(3). At the time of the murders appellant was twenty-one years of age. R.C. 2929.04(B)(4). Appellant was not only the principal offender in these acts, but he was the sole offender in these killings. R.C.2929.04(B)(6). Finally, appellant had a history of prior criminal convictions for drug abuse and aggravated trafficking in drugs. (Tr. 1048-1049). R.C. 2929.04(B)(5).
Under R.C. 2929.04(B)(7) (the catchall provision) we will consider appellant's childhood history and substance abuse. During the mitigation phase, appellant offered testimony from his sister, his mother, and one friend of his mother in an attempt to relate to the jury the difficulties he experienced as a child. Through this testimony it was established that appellant had been physically abused and sometimes abandoned by his mother throughout his childhood. Additionally, testimony was provided which indicated that appellant began to abuse alcohol at a very young age. Eventually, appellant's substance abuse expanded to include marijuana. Testimony and evidence was also provided by appellant to substantiate his psychological problems. But when questioned about appellant's behavior at the time of the crimes, the appellant's psychologist testified:
 "Q Doctor Smith, are you telling this jury that on January 28th of 1994 when Mark Brown went into the Midway Market and aimed and fired a gun nine times at two men, he had no choice?
"A No.
 "Q No. So he had a choice and he made that choice and the results at the Midway Market are what his choice was; is that correct?
"A Yes." (Transcript of Mitigation Phase, p. 296)
While an appellant's history and background relating to an abusive childhood must be considered, they need not necessarily be afforded significant weight. This proposition is clearly illustrated in State v. Rogers
(1985), 17 Ohio St.3d 174, 187, when the Ohio Supreme Court held:
 "During the sentencing phase of his trial appellant presented evidence of the following mitigating factors: (1) his twelve-year institutionalization from age ten to age twenty-two, (2) his mental retardation, (3) his limited (third grade) education, (4) his limited ability to read and write, (5) his lack of familial support, and (6) his history of alcoholism. After careful consideration of the cumulative effect of these mitigating factors on appellant at the time he took the life of Lisa Bates, we can come to no other conclusion than that these factors do not outweigh the heinous nature of the aggravating circumstances surrounding her murder."
Furthermore, the Ohio Supreme Court has consistently held that an individual's voluntary substance abuse deserves minimal weight as a mitigating factor. State v. Goff (1998), 82 Ohio St.3d 123, 143. As to appellant's I.Q., the Ohio Supreme Court has previously held that mental impairment does not preclude the imposition of the death penalty. SeeState v. Rojas (1992), 64 Ohio St.3d 131. Based on our detailed analysis of the mitigating evidence presented herein, we cannot find that any of the mitigating factors which have been collectively addressed under R.C.2929.04(B)(7) are deserving of more than minimal mitigating weight.
In considering the nature and circumstances of the offense, we do not find anything of record which would weigh in favor of mitigation. In fact, the nature and circumstance of the offense support a finding that the aggravating circumstance outweighs the mitigating factors. As has been addressed on numerous occasions, the events surrounding the killings support a finding that appellant acted purposely and without significant provocation. The evidence does not indicate that appellant acted impulsively or without knowledge of what was transpiring.
R.C. 2929.04(C) states, in relevant part:
 "The existence of any of the mitigating factors listed in division (B) of this section does not preclude the imposition of a sentence of death on the offender, but shall be weighed pursuant to divisions (D)(2) and (3) of section 2929.03 of the Revised Code by the trial court, trial jury, or the panel of three judges against the aggravating circumstances the offender was found guilty of committing."
In summation, this court accords little weight to the evidence appellant submitted concerning the mitigating factors set forth in R.C.2929.04(B)(7). Similarly, appellant's history, character, and background offer little in the way of mitigating weight. In contrast, we accord considerable weight to the sole aggravating circumstance and the nature and circumstances of the crime. Consequently, we ultimately find beyond a reasonable doubt that the sole aggravating circumstance of appellant's purposeful taking of two innocent lives outweighs the cumulative effect of all relevant mitigating factors.
Under the final step of this analysis, this court is required to determine if the imposition of the death penalty in the instant case is excessive or disproportionate in comparison to other death penalty cases under our jurisdiction. This court has previously rendered decisions in nine capital cases.
In State v. Reynolds (Jan. 4, 2001), Columbiana App. No. 95-CO-30, unreported, 2001 WL 15790, this court affirmed the death sentence of a man convicted of killing his girlfriend in order to prevent her from revealing an arson they committed.
In State v. Vrabel (Mar. 2, 2000), Mahoning App. No. 95 CA 221, unreported, 2000 WL 246482, this court affirmed the death sentence of a man convicted of killing his wife and daughter. The aggravating circumstance herein was multiple murder.
In the case of State v. Gerish (Apr. 22, 1999), Mahoning App. 92 C.A. 85, unreported, 1999 WL 238943, this court affirmed the conviction and death sentence of a man convicted of killing his mother and an innocent bystander. Multiple murder was also the aggravating circumstance herein. In Gerish,_the defendant also had many similar mitigating circumstances entered into evidence as in our instant case. Both defendants were abused and had abused alcohol and drugs. This evidence was not found to be sufficient to counter the aggravating circumstances.
In other cases such as in State v. Grant (Nov. 9, 1990), Mahoning App. No. 83-CA-144, unreported, this court affirmed the conviction and death sentence of a woman convicted of the purposeful killing of her two children during an aggravated arson.
In State v. Hudson (May 29, 1993), Jefferson App. No. 88-J-40, unreported, 1993 WL 181334. Hudson had been convicted of the kidnapping and purposeful killing of another man. The facts showed that Hudson and three other men lured the victim from his home by telling him that a friend needed his help, then drove the victim to a remote area where he was beaten, stabbed and shot. On appeal, this court reversed Hudson's death sentence.
In State v. Eley (Dec. 20, 1995), Mahoning App. No. 87-CA-122, unreported, 1995 WL 758808, this court affirmed the death sentence of defendant after his conviction of aggravated murder with a death penalty specification that the murder was committed during or immediately after the commission of an aggravated robbery. The defendant killed the owner of a grocery store during a robbery attempt committed with the assistance of an accomplice.
In State v. Palmer (Aug. 29, 1996), Belmont App. No. 89-B-28, unreported, 1996 WL 495576, this court affirmed the death sentence of defendant after his conviction on two counts of aggravated murder with the death penalty specification that the murders were committed during the course of aggravated robbery. The defendant and an accomplice murdered and robbed two victims leaving their bodies along a roadside.
In State v. Spivey (Jan. 13, 1997), Mahoning App. No. 89-CA-172, unreported, this court affirmed the death sentence of defendant after his conviction of aggravated murder with the death penalty specification that the murder was committed during the course of an aggravated burglary, aggravated robbery, and grand theft of a motor vehicle. Spivey broke into an individual's home, stabbed her and brutally beat her to death before robbing the house and fleeing the scene in the victim's automobile.
In State v. Twyford (Sept. 25, 1998), Jefferson App. No. 93-J-13, unreported, 1998 WL 671382, Twyford and another man were convicted of the kidnapping, robbery, and murder of a man. Twyford had deceived the individual into believing that he was going hunting. The defendants mutilated the body of the victim before disposing of it. This court affirmed Twyford's death sentence.
Although four of the above cases involve multiple murders, (i.e.,Vrable, Grant, Palmer, and Gerish), two involved the situation where the multiple-murder aggravating circumstance was the sole aggravating circumstance. In addition, we will look to similar cases decided by the Ohio Supreme Court to substantiate our proportionality review.
Since 1986, the Supreme Court has reviewed numerous death penalty cases where the multiple-murder aggravating circumstance under R.C. 2929.04(A)(5) was the only circumstance present. See State v. Brooks (1986),25 Ohio St.3d 144; State v. Bedford (1988), 39 Ohio St.3d 122; State v.Sewell (1988), 39 Ohio St.3d 322; State v. Lawrence (1989),44 Ohio St.3d 24; State v. Coleman (1989), 45 Ohio St.3d 298; State v.Moreland (1990), 50 Ohio St.3d 58; State v. Combs (1991),62 Ohio St.3d 278; State v. Williams (1996), 74 Ohio St.3d 569 and Statev. Awkal (1996), 76 Ohio St.3d 324.
Of the above cases, the Supreme Court has affirmed the death penalties in all but one. In many of those cases, the defendant was either under significant emotional stress or lacked substantial capacity to conform his conduct to the law due to mental illness or defect. See Moreland andAwkal. In addition, like the appellant, the defendants in Moreland andAwkal could point to bad childhoods in an attempt to establish mitigating evidence.
In Lawrence, the Supreme Court found that the mitigating factors outweighed the single multiple-murder aggravating circumstance and, therefore, vacated the death sentences. However, the mitigating factors in Lawrence_included provocation, post-traumatic stress disorder arising to the level of a diminished-capacity mitigating factor under R.C.2929.05(B)(3), a severe depression following the death of the defendant's infant son, lack of a significant history, the defendant's voluntary military service and care for his family. In comparison, the mitigating factors in this area are nearly nonexistent.
In all of the remaining cases decided by the Supreme Court, all the defendants submitted mitigating evidence similar to that submitted by appellant herein, i.e., troubled and/or abusive childhoods, problems with drugs and/or alcohol, possible mental problems, etc., and the death sentences were upheld by the Ohio Supreme Court.
Based upon the foregoing, we find that under R.C. 2929.05 the death sentence imposed upon appellant herein is not disproportionate to the penalty imposed in similar cases decided by the Ohio Supreme Court. Therefore, the death penalty was appropriate. In addition, having found each of appellant's fifteen assignments of error without merit, we hereby affirm the judgment of the trial court.
COX, J., dissents in part; see dissenting in part opinion VUKOVICH, J., concurs
[1] "Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender."
[2] "The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."
[3] Even assuming the veracity of appellant's claim, we have held that "an agreement to attempt to get bond reduced does not rise to the level of police coercion * * *." Burley, 1998 WL 544509 at *7.